# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

────────

No. 15-10242

────────

United States Court of Appeals
Fifth Circuit

**FILED**

September 9, 2016

Lyle W. Cayce
Clerk

BRUCE IBE; DEAN HOFFMAN; ROBERT FORTUNE; JASON MCLEAR

Plaintiffs - Appellants

v.

JERRAL WAYNE JONES, also known as Jerry Jones; BLUE & SILVER, INCORPORATED; DALLAS COWBOYS FOOTBALL CLUB, LIMITED; JWJ CORPORATION; COWBOYS STADIUM, L.P.; COWBOYS STADIUM GP, L.L.C.; NATIONAL FOOTBALL LEAGUE,

Defendants - Appellees

----------------------------------------

KEN LAFFIN, Individually and On Behalf Of All Others Similarly Situated; DAVID WANTA, Individually and On Behalf Of All Others Similarly Situated; REBECCA BURGWIN, Individually and On Behalf Of All Others Similarly Situated,

Plaintiffs - Appellants

v.

NATIONAL FOOTBALL LEAGUE; COWBOYS STADIUM GP, L.L.C.; COWBOYS STADIUM, L.P.; DALLAS COWBOYS FOOTBALL CLUB, LIMITED; JWJ CORPORATION

Defendants - Appellees

No. 15-10242

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and JONES and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Plaintiffs-Appellants ("Appellants") purchased tickets to Super Bowl XLV, but were either displaced from their seats, relocated, or had an obstructed view of the field. The majority of affected ticketholders settled with the National Football League (the "NFL"). Appellants, however, elected to sue, alleging various claims relating to breach of contract and fraud. One group of Appellants sought to certify three separate class actions. Most of Appellants' claims were dismissed before trial, and class certification was denied. Seven individual Appellants went to trial against the NFL and prevailed on breach of contract, but not on fraudulent inducement claims. The impetus for this appeal seems to be the denial of class certification, but Appellants also contest the court's elimination, by dismissal or summary judgment, of several claims. We **AFFIRM** the judgment.

## BACKGROUND

Some will remember Super Bowl XLV as a close game between two legendary franchises, the Green Bay Packers and the Pittsburgh Steelers. Others will recall the unexpected ice storm that blanketed the DFW Metroplex the week of the game. Yet the memories of others will involve a multi-issue seating fiasco inside one of the nations' most celebrated venues—Cowboys Stadium.[1] This story began back when the North Texas Bid Committee (the

[1] Presently known as AT&T Stadium.

No. 15-10242

"Committee") submitted its bid to host Super Bowl XLV. Although Cowboys Stadium had not been built, the Committee billed the venue as a new state-of-the-art stadium capable of holding as many as 100,000 fans.

In preparation for the game, the Committee and the NFL entered into a stadium license agreement, which provided that the Committee would bear the responsibility of installing temporary seating to bring the minimum capacity up to 93,221. The agreement provided that the temporary seats be of a suitable standard commensurate with the quality and standards of the NFL Super Bowl viewing experience, including appropriate sightlines and access to concessions stands and restrooms. The agreement also required that all temporary seating be installed and approved by January 30, 2011 (one week before the game).

Cowboys Stadium contracted Seating Solutions to install approximately 13,000 temporary seats for the game. The NFL hired Populous, an architectural design firm, to review and evaluate the installation plans. After Seating Solutions initially submitted its temporary seating plans, Populous noted, *inter alia,* several sightline issues. As a result, over 1,000 seats were marked as having a "restricted view." Additional seats were removed from the plans in early January during the quality control process.

Installation of the temporary seating began in the second week of January 2011. On January 30, the deadline for temporary seat installation, seats were yet to be installed or approved by the local safety authorities. Installation continued the week before the game and additional crews were brought to help Seating Solutions complete the work. The work was still ongoing at noon on Super Bowl Sunday. Ultimately, not all of the seats were ready. Approximately 400 ticketholders were left without seats, another 850 or so ticketholders were relocated to seats in other parts of the stadium, and roughly 2,000 ticketholders were delayed in reaching their seats.

No. 15-10242

The NFL apologized for the seating debacle and offered compensation to all ticketholders who were displaced, relocated, or delayed.[2]  Nevertheless, two class action lawsuits were filed in the Northern District of Texas against the NFL and the Cowboys franchise defendants (the "Cowboys").  After consolidation, Appellants' complaint identified three putative classes: (1) the "Displaced Class," consisting of all ticketholders who were left without seats; (2) the "Relocated/Delayed Class," consisting of all ticketholders who were relocated to a different seat or were significantly delayed in getting to their seats; and (3) the "Obstructed View Class" consisting of all ticketholders who were assigned seats with obstructed views of the field, the video board, and/or the stadium, but whose tickets were not marked as a restricted view seat.  In their first amended complaint, Appellants raised claims for breach of contract, fraudulent inducement, fraudulent concealment, negligent misrepresentation by affirmative misrepresentations, and negligent misrepresentation by concealment, and negligence.  In addition, three of the Appellants alleged Deceptive Trade Practices Act ("DTPA") violations by all Appellees.

The NFL responded by moving to dismiss all the tort claims on the basis of Texas's "economic loss rule," which bars recovery in tort for economic losses resulting from a party's failure to perform under a contract.  The NFL also urged that the remaining claims for fraudulent inducement were not pled with specificity under Fed. R. Civ. P. 9(b).  The Cowboys moved to dismiss all claims against them because they had no contractual relationship with the Appellants.

The district court granted in part the NFL's motion to dismiss and dismissed the Cowboys defendants.  The court dismissed with prejudice

---

[2] According to the NFL, approximately 90% of the displaced fans and 70% of the relocated or delayed fans ultimately accepted the NFL's settlement offers and signed a release of all claims.

No. 15-10242

Appellants' claims of fraudulent concealment and negligent misrepresentation against the NFL as barred by the economic loss rule. The court held that Appellants' theory of fraudulent inducement as to the seats that were not completed by game day was not plausible because the NFL had nothing to gain by tricking fans into purchasing tickets that it did not plan on having available. Quite the contrary, efforts to install the seats were ongoing until hours before the game. The district court accordingly dismissed the Displaced and Relocated ticketholders' fraudulent inducement claims with prejudice.[3] The court dismissed the Cowboys, who owed no duty to Appellants because the Cowboys were not a party to the contracts between Appellants and the NFL.

Subsequently, the court denied Appellants' motion for class certification. With respect to the Displaced Class, the court found certification inappropriate because Appellants failed to show that the proposed class satisfied Fed. R. Civ. Pro. 23(a)'s numerosity requirement, and because individual damages issues predominated over the common legal issue of liability.

Concerning the Relocated Class, the court denied certification because individual issues predominated over the common issues of contract interpretation. The court stated that whether a ticketholder received a replacement seat of "less quality" than his original seat could not be decided on a class-wide basis because every seat is unique and each class member would need to prove individual damages.

Similarly, the court determined that liability and damages for the Obstructed View Class would require predominantly individualized inquiries

---

[3] Additionally, the court dismissed the named ticketholders' DTPA claims with prejudice because, as members of the Displaced Class, they lacked standing to assert claims for failure to disclose that certain seats had obstructed views. The district court, however, dismissed without prejudice claims for failure to disclose as to other potential ticketholders who had an obstructed view seat.

regarding the extent of the obstruction, if any, and each class member's individual damages. The court also found that this class's fraudulent inducement claim required resolution of predominant individual liability issues: the alleged nature of the misstatement or omission and Appellants' individual reliance.

The district court next granted the NFL's motion for summary judgment as to Appellants' breach of contract and fraudulent inducement claims based on obstructed views of the video board. The court found that there was no contract for an unobstructed view of the video board nor any ambiguity in the ticket term "a spectator seat for the game." And because Appellants pointed to no evidence outside of the ticket terms that imposed a duty on the NFL to provide an obstructed view of the video board, the district court rejected fraudulent inducement claims as a matter of law.

The parties proceeded to trial on the remaining claims: the breach of contract claims of three displaced ticketholders, two relocated ticketholders, and two obstructed-view ticketholders, and the fraudulent inducement claims of two obstructed-view ticketholders.[4] On the seventh day of the trial, the district court granted the NFL's motion for a directed verdict on Appellants' request for punitive damages because no reasonable jury could find fraud by clear and convincing evidence.

On March 12, 2015, the jury returned a verdict in favor of the ticketholders on their breach of contract claims and in favor of the NFL on the remaining fraudulent inducement claims. The jury awarded damages ranging from $5,670 to $22,000. The ticketholders timely appealed.

---

[4] The negligence claims against the NFL were pleaded in the alternative to Appellants' breach of contract claims.

No. 15-10242

## DISCUSSION

Appellants challenge nearly every dispositive decision by the district court: (1) the dismissal of the Cowboys and fraud-related claims; (2) summary judgment on obstructed-view claims; and (3) the denial of class certification. Appellants also take issue with denial of a jury instruction and the court's directed verdict on punitive damages. We address these issues in sequence.

### A. Dismissal of the Cowboys and Fraud-related Claims

This court reviews motions to dismiss pursuant to Rule 12(b)(6) de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

*1. Claims against the Cowboys.*

Under Texas law, "a party generally must be a party to a contract before it can be held liable for a breach of the contract." *Hoffman v. AmericaHomeKey, Inc.,* 23 F. Supp. 3d 734, 739 (N.D. Tex. 2014) (citing *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 387 (Tex. App.—Dallas 2012, no pet.)). To establish contract formation, a party must prove "an offer and acceptance and a meeting of the minds on all essential terms." *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 454-55 (Tex. App.—Dallas 2012, pet. denied).

The district court dismissed the breach of contract claims against the Cowboys because Appellants made no plausible allegations that the Cowboys were anything more than third-party vendors of tickets to an NFL event.

7

No. 15-10242

On appeal, Appellants first argue that dismissal of their breach of contract claim against the Cowboys—and of their tort claims premised on the existence of contracts with the Cowboys—was improper. They contend that they pled sufficient facts, based on the sale invoices of game tickets and parking sold by the Cowboys to permit a plausible inference that one or more of the Cowboys defendants were parties to the ticket contracts. In support of this position, Appellants cite cases[5] holding that invoices can constitute contracts between parties to a sale.

The cases are inapposite, because the invoices to which they refer contained additional terms relating to third parties. The Super Bowl tickets, in contrast, reference the Cowboys' name solely to identify the stadium. The Cowboys delivered NFL's tickets and sold parking. Although Appellants make additional allegations suggesting that the Cowboys were more than just a third-party vendor, the terms of the ticket are unambiguous. The ticket states: "[a]dmission may be refused or ticketholder ejected at the sole discretion of the National Football League." Because Appellants have presented no authority supporting that a third-party vendor with limited responsibility is also responsible for the performance of the express ticket terms, Appellants' argument that the Cowboys are liable for their tort claims fails.[6]

---

[5] *Hawkins v. Frick-Reid Supply Corp.*, 154 F.2d 88, 88-89 (5th Cir. 1946); *Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 4372486, at *5 (S.D. Tex. Sept. 19, 2011).

[6] The Appellants also argue that the Cowboys and the NFL were agents of one another, and thus Appellants were free to sue either or both of them for breach of contract. This argument was not presented to the district court. Appellants urge the court to infer from their complaint a breach of contract agency theory. We decline to do so and thus consider Appellants agency argument waived. *See Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010)) ("Review of a Rule 12(b)(6) dismissal is, by its very nature, limited to the allegations and theories set forth in the complaint that the district court had before it when granting the motion to dismiss."); *Hogan v. City of Hous.*, 819 F.2d 604 (5th Cir. 1987) (reviewing dismissal under Rule 12(b)(6), "we consider only the pleadings and accept them as true")

No. 15-10242

## 2. Displaced ticketholders' fraudulent inducement claims.

Under Texas law, the elements of common-law fraud are: (1) a material misrepresentation, (2) which was false, and (3) which was either known to be false when made or was asserted without knowledge of the truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). "Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance made with no intention of performing at the time it was made." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015).

Fed. R. Civ. P. 9(b) requires that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." The complaint must thus set forth specific facts supporting an inference of fraudulent intent. *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).

In dismissing the Displaced and Relocated Ticketholders' fraudulent inducement claims, the district court held:

> Without alleging facts supporting the allegation that Defendants did not intend to construct the temporary seats for which tickets were sold, Plaintiffs cannot recover on a theory of fraudulent inducement as to temporary seats that were not completed and approved by game day. . . . The Court finds that Plaintiffs' theory of fraudulent inducement as to temporary seating is not plausible.

Challenging the dismissal, Appellants contend that they were not required to allege that the NFL had a specific intent not to perform the ticket contract, but only needed to allege that the NFL recklessly made a promise to perform. Appellants mistakenly cite *Custom Leasing, Inc. v. Tex. Bank & Trust Co. of Dall.*, 516 S.W.2d 138, 143 (Tex. 1974), a case involving fraudulent misrepresentations, not fraudulent inducement. Fraudulent inducement, as the district court understood, rests on a misrepresentation made with the

intent to deceive and no intention of performing the act at the time the promise was made. *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). Appellants' recklessness allegation was insufficient.

Alternatively, Appellants argue that they plausibly pled Appellees' specific intent to defraud. In support of their contention, they point to statements made by Seating Solutions in a press release dated January 27, 2011, claiming that they had created a terrific fan experience in every way maximizing safety, comfort and sight-line; a statement made by Jerry Jones that, due to brisk sales, he wanted to print more tickets; and numerous statements related to the allegation that Jones was unabashed in his desire to set the Super Bowl attendance record. They also point to facts showing that the NFL wanted to maximize profit and "wanted to avoid a public relations debacle before the game." Finally, they argue that the NFL had knowledge from which it could be inferred that the seats would not be completed by game day, but failed to inform ticketholders.

None of these allegations suggests an intent not to perform at the time the ticket contracts were sold. Indeed, given the frantic last-minute installation of seats and potential adverse publicity from intentional non-performance, an inference of fraudulent inducement is untenable.

*3. Fraudulent concealment and negligent misrepresentation claims.*

The district court dismissed Appellants' fraudulent concealment and negligent misrepresentation claims holding that they were foreclosed by the economic loss rule. Under Texas law, the independent injury rule—also referred to as the economic loss rule—precludes recovery in tort when the loss complained of is the subject matter of a contract between the parties. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). In *DeLanney*, the Texas Supreme Court explained:

No. 15-10242

> If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort.  Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*Id.*  In determining whether a claim can be brought as a tort, consideration must be given to "the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff."  *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996).

Challenging the dismissal, Appellants argue that their claims fell within the well-recognized exception to the economic loss rule: "if a plaintiff presents legally sufficient evidence on each of the elements of a fraudulent inducement claim, any damages suffered as a result of the fraud sound in tort" because "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998). Because there is no plausible case for fraudulent inducement, this exception carries no weight.  Moreover, in tallying damages like travel costs, Appellants alleged no damages independent from those resulting from the breach of contract.  The economic loss rule bars these claims.[7]  *See TIB--The Indep. BankersBank v. Canyon Cmty. Bank*, 13 F. Supp. 3d 661, 671 (N.D. Tex. 2014).

---

[7] Appellants make no new arguments to defend their fraud-based DTPA claims, which are infirm for the reasons detailed in reference to the other fraud-related claims.

**B. Summary Judgment on Obstructed View Claims**

Summary judgment motions are reviewed de novo, using the same standard as the district court: viewing "all facts and evidence in the light most favorable to the non-moving party." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015). Summary judgment is appropriate if the record discloses "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

*1. Contract claims based on an obstructed view of the video board.*

Under Texas law, "the interpretation of an unambiguous contract is a question of law for the court to decide." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). Courts are to "give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *Id.*

Appellants argue that the ticket contract, which promised the ticketholder "a spectator seat for the game," is ambiguous. They first contend that the language cannot be given a definite or certain legal meaning because it is well known that at Cowboys' Stadium, the video board is very much part of the game-viewing experience.

We disagree. The ticket speaks for itself: "a spectator seat for the game" is a spectator seat for the Super Bowl game played on the field. Further, the interpretation offered by Appellants is not reasonable. As noted by the district court, if the term "a spectator seat for the game" were interpreted to include

the football game displayed on the video board, every ticketholder would have a breach of contract claim if the video board malfunctioned, even if he had a full view of the field. The unambiguous term of the contract entitling ticketholders to "a spectator seat for the game" was not breached by an obstructed view of the video board.

### 2. Fraudulent inducement claims based on an obstructed view of the video board.

"As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Therefore, "silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Id.* Whether such a duty exists is a question of law. *Id.*

The district court dismissed Appellants' claims for lack of evidence that the ticket terms imposed a duty on the NFL to disclose that the view of the video board was obstructed.

As just noted, the NFL bore no contractual obligation to provide seats with a view of the video board. The tickets themselves were not misleading. Consequently, the premise of Appellants' argument—that the NFL had a duty to disclose that it knew that prior affirmative statements on the tickets suggesting there were no obstructed views was false or misleading—fails. *Cf. Shangong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1035 (5th Cir. 2010) (internal quotation marks and citations omitted) ("a duty to speak arises between non-fiduciaries when one party learns later that his previous affirmative statement was false or misleading"). Neither the NFL nor the ticket contract made reference to the video board.

Appellants also rely on this court's holding in *Union Pac. Res. Grp, Inc. v. Rhône–Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001); "A duty to speak

13

arises by operation of law when . . . one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth[.]"  This argument is unavailing for three reasons.  First, *Union Pacific* was decided before the Texas Supreme Court stated in *Bradford* that Texas has "never adopted" the rule recognizing a general duty to disclose facts in a commercial setting.  48 S.W.3d at 755-56; *Coburn Supply Co. v. Kohler Co.*, 342 F.3d 372, 377 (5th Cir. 2003).  Second, Appellants present no evidence to suggest that the NFL knew that Appellants were relying on the alleged concealed fact.  Third, by its nature, a fraudulent inducement claim cannot be premised on alleged post-contractual conduct.  Appellants were not fraudulently induced to buy Super Bowl tickets thinking they would see the game on the video board.

### C. Denial of Class Certification

This court reviews a denial of class certification for abuse of discretion and the legal questions implicated by the denial are reviewed de novo.  *In re Rodriguez*, 695 F.3d 360, 364 (5th Cir. 2012).  "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation."  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)).

Rule 23 governs whether a proposed class falls within the limited exception to "the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  Four prerequisites must be met by all classes: numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The party seeking class certification bears the burden of demonstrating that the requirements of Rule 23 have been met. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003).

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." "[A] plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981). This court, however, has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Rather, "a number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

Pursuant to Rule 23(a)(2), there must be "questions of law or fact common to the class." The Supreme Court has explained that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349 (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, (1982)). Dissimilarities among class members should be considered to determine whether a common question is truly presented. *Id.* at 359. Even a single common question of law or fact can suffice to establish commonality, *id.*, so long as resolution of that question "will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke," *id.* at 350.

Rule 23(a)(3) provides that "the claims or defenses of the representative parties [must also be] typical of the claims or defenses of the class." The typicality inquiry rests "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims." *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

Moreover, Rule 23(a)(4) requires the party seeking certification to show that "the representative parties will fairly and adequately protect the interests of the class." This standard "requires the class representatives to possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001).

Nonetheless, class certification is permitted only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Mullen*, 186 F.3d at 626 (quoting *Jenkins*, 782 F.2d at 472). Determining whether legal issues common to the class predominate also requires that this court inquire how the case will be tried. *O'Sullivan*, 319 F.3d at 738. "This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*

Generally, individualized damages calculations will not preclude a finding of predominance. *See Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036,

1045 (2016)(quoting 7AA C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §1788, pp. 123-34 (3d ed. 2005) (footnotes omitted) ("[I]t uniformly has been held that differences among the members [of a class] as to the amount of damages incurred does not mean that a class action would be inappropriate.")).    Nothing in this general language from *Tyson Foods*, however, alters this court's holdings that class treatment "may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).  "Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried.  In such cases, class certification is inappropriate." *O'Sullivan*, 319 F.3d at 744-45.

Finally, to determine whether a class action is the superior method for adjudicating the controversy, the district court must compare and "assess the relative advantages of alternative procedures for handling the total controversy." *In re TWL Corp.*, 712 F.3d at 896 (quoting Fed. R. Civ. P. 23(b)(3) Advisory Committee's Note to 1966 Amendment).  The superiority analysis is fact-specific and varies depending on the circumstances of each case.  *Id.* Among the factors for the court to consider are "(A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties encountered in managing a class action." *Amchem Prods., Inc.*, 521 U.S. at 615-616.

No. 15-10242

*1. The Displaced Class.*

The district court denied certification of the Displaced Class after holding that Appellants had failed to demonstrate that the class was so numerous that joinder of all members was impracticable. Alternatively, the district court found that individual issues of damages predominated over the one remaining common legal issue—whether the ticket terms require the NFL to refund the face value of the ticket, or whether purchasers are entitled to damages generally recoverable for a breach of contract. Because the proposed class fails the numerosity test, we need not discuss the court's predominance conclusions concerning this class.

On numerosity, Appellants argue that even accepting the NFL's estimate that the Displaced Class consisted of 42 class members as opposed to 55, a presumption of impracticability was raised. In support of their argument, Appellants cite to *Mullen* as adopting the proposition suggested in *Newberg on Class Actions*: a class of forty or more members should raise the presumption that joinder is impracticable. 186 F.3d at 624. But *Mullen* also stated that "the number of members in a proposed class is not determinative of whether joinder is impracticable." *Id.* This court has repeatedly counseled that "courts must not focus on sheer numbers alone." *In re TWL Corp.*, 712 F.3d at 894 (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000)). In fact, Appellants' counsel are currently pursuing a "mass" action for 237 individual Super Bowl XLV ticketholders in the same district court. *Greco v. Jones,* No. 3:13-CV-1005-M (N.D. Tex.). We find no clear error in the district court's determination that Appellants failed to meet the threshold numerosity requirement.

*2. The Relocated Class.*

The district court denied certification of the Relocated Class after holding that individual issues predominated over common issues. The court

found that the common issue of contract interpretation—whether the NFL breached the ticket terms by relocating any ticketholder—was overwhelmed by two individualized issues:  a front-end inquiry to determine membership in the class—*i.e.*, those who received inferior seats—and a back-end inquiry to determine individual damages.

Appellants assert that individual issues did not predominate over common issues and repeat the contention, *inter alia*, that different amounts of damages do not preclude class certification. These arguments are unconvincing.  There was no record of what replacement seat was received by each relocated ticketholder.  Whether a class member actually received a lesser-quality seat and how the relocated seat affected damages raised complex and individualized issues that could not be resolved by common evidence.

As was discussed above, this circuit recognizes that individual damages issues can preclude class certification.  *See Bell Atl. Corp., 339* F.3d at 307; *O'Sullivan,* 319 F.3d at 744-45; *see also Allison,* 151 F.3d at 413 ("[A]s claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards…increases."); *cf. Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 298 (5th Cir. 2001)(finding that common issues predominated despite the need for individualized damages where "virtually every issue prior to damages is a common issue.").

In *In re Deepwater Horizon,* 739 F.3d 790, 816 (5th Cir. 2014), on which Appellants rely, this court upheld a finding of predominance despite diverse damages because "even without a common means of measuring damages, [the] common issues [of fact and law] nonetheless predominated over the issues unique to individual claimants." In contrast here, we agree with the district court that individual damages issues predominated over the common issue of

breach because ticketholders incurred vastly different expenses, which would essentially necessitate mini-trials to adjudicate damages for each ticketholder.

It is also no support for certification that another circuit has held that "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir. 2001). This observation was not made in the context of a predominance analysis, but in the discussion of the "manageability" of the potential class action. *Id.* Moreover, this court has made clear that "[a] district court cannot manufacture predominance through the nimble use of" management tools. *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n.21 (5th Cir. 1996). Nor does any authority require the district court to use case management tools within its discretion.

Accordingly, the district court did not abuse its discretion in refusing to certify this class. *See Hesling v. CSX Transp., Inc.,* 396 F.3d 632, 638 (5th Cir. 2005).

### 3. The Obstructed-View Class.

The district court denied certification of the Obstructed-View Class, concluding that individualized inquiries predominated about the extent of the obstruction and the personal damages alleged by each class member. The court also held that the fraudulent inducement claims required resolving predominant individual issues. Specifically, the alleged misstatement or omission, and each Appellants' reliance on any such misstatement or omission.

Appellants first contend that the district court erred in holding that an individualized inquiry to determine the extent of obstruction—or the materiality of the breach—was required because common evidence showed that any obstructed view of the field was material. In support of their contention, Appellants argue that tickets marked "restricted view" were sold

20

at the reduced price of $600, regardless of the extent of the obstruction. Further, even if the extent of the obstruction was relevant, it could be proved by common evidence in the form of sightline projections and analysis performed by Populous and Seating Solutions.

We are not persuaded. The fact that the NFL sold all tickets marked "restricted view" at the same price does not by itself establish that any obstruction constituted a material breach of the ticket contract. Under Texas law, materiality of a party's breach of contract is determined by considering five factors, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004) (quoting Restatement (Second) of Contracts § 241 (1981)). In this case, a jury could reasonably find that a minor obstruction, while a breach of the ticket contract, was not material because the ticketholder could still fully enjoy the game.

The district court rejected Appellants' contention that they could use computer modeling and sightline studies to establish the existence and extent of any obstruction; we agree. The court observed that while it may be possible for such a program to identify seats with obstructed views, this does not eliminate the need to evaluate the extent of obstruction actually experienced by individual class members; even if Appellants hired an expert to present the models, the jury would still need to determine if every identified seat was obstructed.

With respect to the fraudulent inducement claim, Appellants contend that the district court erred in holding that reliance was an individual issue. Appellants rely on *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), a case involving primarily a failure to disclose under the Securities Exchange Act, where the court held that proof of reliance was not a prerequisite to recovery. The court stated: "[a]ll that is necessary is that the

21

facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [a] decision." *Id.* Recognizing this fact, this court has confined the presumption to SEC Rule 10b-5 claims based on fraudulent omission.[8] No Texas cases appear to cite *Affiliated Ute* or to apply the *Ute* presumption.[9]

Moreover, as the NFL notes, presuming class-wide reliance would be particularly inappropriate under the circumstances of this case. The district court found, and Appellants do not dispute, that the evidence suggested that different ticketholders had different expectations regarding their seats—some likely relied on a lack of notice that their views would be restricted when they purchased their seats, but others purchased seats without obtaining any information about them. Because expectations varied, the materiality of the omission may have significantly differed from person to person, undermining the very premise of the *Ute* presumption.

---

[8] *See Griffin v. Box*, No. 94-10348, 1991 WL 255296, at *16 n. 17 (5th Cir. May 2, 1996) ("Ute presumption applies only to rule 10b-5 actions based primarily upon omissions rather than misrepresentations.") (internal quotations and citations omitted); *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988) ("[T]he first step in determining whether the *Affiliated Ute* presumption applies is to identify whether the plaintiff's claim is founded on a fraudulent omission. This in turn depends upon which of the three subsections in Rule 10b-5 forms the basis for the plaintiff's complaint."); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987) (in *Affiliated Ute*, "the Supreme Court held that the 10b-5 plaintiff does not have to present positive proof of reliance in all securities fraud settings.").

[9] Appellants point to one district court case purporting to extend the application of the *Ute* presumption outside of the federal securities context. In *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 220 (N.D. Tex. 2000), the court acknowledged that "*Ute* involved an interpretation of a federal securities statute." The court, however, cited another district court decision for the general proposition that, in *Ute*, "the 'Supreme Court held that positive proof of reliance is unnecessary in cases involving primarily a failure to disclose.'" *Id.* (quoting *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 275 (N.D. Tex. 1990)). Importantly, *Steiner* is itself a federal securities case involving a claim brought under Rule 10b-5, and thus does not support the extension of the *Ute* presumption to claims of common law fraud. *Id.* at 272.

No. 15-10242

Because the *Ute* presumption does not apply, the only issues common to the Obstructed-View Class were breach of contract and whether the NFL had a duty to disclose any obstructed views of the field or the video board. The district court held these issues were outweighed by individual issues of materiality, damages, and reliance. The court did not abuse its discretion in determining that individual issues predominated and that class certification was inappropriate. *See Crutchfield v. Sewerage & Water Bd. Of New Orleans,* No. 15-30709, slip op. at 6 (5th Cir. July 13, 2016 ("[A] district court's expertise in case management and overseeing trials is particularly useful in making the predominance and superiority inquiries of Rule 23(b)(3), which require envisioning what a class trial would look like").

### D. Jury Instruction

This court reviews under the abuse of discretion standard a district court's refusal to provide a requested jury instruction. *Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.,* 276 F.3d 704, 714 (5th Cir. 2002). This court will reverse the district court's decision "only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *Id.*

"A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex. 1986). In other words, a breach of contract is only actionable as fraudulent inducement if it is "coupled with a showing that the promisor never intended to perform under the contract." *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.,* 646 F.3d 321, 325 (5th Cir. 2011).

23

The district court gave a jury instruction stating the elements of fraudulent inducements as pronounced by the Texas Supreme Court in *DeSantis*, 793 S.W.2d at 688. Appellants do not challenge that instruction. Rather, they challenge the district court's refusal to give an additional instruction on fraud through failure to disclose.[10] Appellants assert that by refusing to give the proposed instruction, the district court prevented the jury from considering whether the NFL committed fraud by failing to disclose material facts concerning the obstructed view of the playing field.

The sole tort claim remaining when the case went to trial was a claim of fraudulent inducement, and the district court gave a correct, complete instruction on that claim. Appellants cite to *Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289 (Tex. App.—Corpus Christi 2000, no pet.), to argue that their fraudulent inducement claim can be proven with fraudulent conduct occurring after the execution of a contract. The court in *Kajima*, however, made clear that the consideration of post-execution fraud evidence was necessary because the defendant made post-execution promises in order to induce the plaintiff into continuing its performance. *Id.*

Conversely here, there was no continued performance induced by post-execution fraud; there was only the single ticket contract—a promise of future performance given in exchange for the ticket price. Texas law is clear that a promise of future performance is actionable as fraudulent inducement when it

---

[10] Proposed Jury Instruction No. 18 read: As to plaintiffs [INSERT PLAINTIFFS' NAMES HERE], you may also conclude that the NFL committed fraud through a failure to disclose. The elements of fraud through a failure to disclose must be proven by a preponderance of the evidence: First, the NFL failed to disclose a material fact within the knowledge of the NFL; Second, the NFL knew that the plaintiff at issue is ignorant of the fact and does not have an equal opportunity to discover the truth; Third, the NFL intended to induce the plaintiff at issue to take some action by failing to disclose the fact, and Fourth, the plaintiff at issue suffered some injury as a result of acting without knowledge of the undisclosed fact.

is "made with the intention, design and purpose of deceiving and with no intention of performing the act." *Spoljaric*, 708 S.W.2d at 434. Because the district court gave a correct instruction on fraudulent inducement, the court did not abuse its discretion in declining to give the proposed jury instruction.[11]

## CONCLUSION

We find no error in the district court's 12(b)(6), Rule 56, and directed verdict rulings. We also hold that the district court did not abuse its discretion in denying to give Appellants' proposed jury instruction. Finally, in denying class certification, the district court carefully applied the class certification principles to each class, and we agree with its conclusions. Accordingly, we **AFFIRM**.

---

[11] Appellants briefly argue that the district court erred in granting a directed verdict on their punitive damages request (based on their obstructed view of the video board fraud claim). Because the court properly dismissed the fraud claim on summary judgment, this argument is meritless.

The district court did grant in part the NFL's Rule 50 Motion for Judgment as a Matter of Law, holding that no reasonable jury could find fraud by clear and convincing evidence and thus Appellants were not entitled to exemplary damages as a matter of law. That ruling, however, is not expressly appealed, and any challenge to it is waived. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).