# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50175

United States Court of Appeals
Fifth Circuit

**FILED**
February 21, 2020

Lyle W. Cayce
Clerk

WEALTHMARK ADVISORS INCORPORATED; DAVID SHIELDS,

      Plaintiffs - Appellants

v.

PHOENIX LIFE INSURANCE COMPANY; PHL VARIABLE INSURANCE COMPANY,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:16-CV-485

Before KING, JONES, and DENNIS, Circuit Judges.

PER CURIAM:*

Appellant Wealthmark Advisors, Inc. ("Wealthmark") challenges the judgment for more than $3 million for its breach of contract with Appellees. Having carefully considered the briefs, oral argument and pertinent portions of the record, we find no reversible error of fact or law and AFFIRM.

In 2010, Wealthmark entered into an Annuity Distributor Agreement (the "Distributor Agreement") with Phoenix Life Insurance Company

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-50175

("Phoenix") whereby Wealthmark agreed to sell Phoenix annuities in exchange for sales commissions. Under the Distributor Agreement, if Phoenix had to refund to a policyholder a premium on an annuity that Wealthmark had sold, Wealthmark was required to repay to Phoenix the commission on the sale. Over the years, Wealthmark and its representatives successfully sold millions of dollars in Phoenix products and were paid accordingly. But in 2014, the Minnesota Attorney General sued a Wealthmark representative named Anthony Friendshuh, alleging Friendshuh had made misrepresentations to consumers in connection with his sales of Phoenix annuities. Phoenix's parent company stepped in and settled the case, but not before agreeing to an Assurance of Discontinuance that resulted in Phoenix's providing monetary relief on 248 annuities (the "Annuities"). In total, Phoenix returned over $27 million in premiums and interest.

Predictably, Phoenix demanded Wealthmark repay the commissions on the Annuities. Wealthmark refused and sued Phoenix in state court for negligence, seeking a declaration that the Distributor Agreement did not require Wealthmark to return any sales commissions. After removing the case to federal court, Phoenix filed a counterclaim against Wealthmark for breach of contract, alleging Wealthmark breached the Distributor Agreement by failing to repay the commissions. Phoenix then moved for partial summary judgment as to liability on Wealthmark's negligence claim and Phoenix's breach of contract counterclaim. The district court, approving a magistrate judge's report and recommendation, granted Phoenix's motion, and the case proceeded to a bench trial on damages. Wealthmark now appeals the district court's adverse summary judgment as well as two evidentiary rulings made during the damages trial. We turn first to the summary judgment.

No. 19-50175

We review the granting of a motion for summary judgment *de novo*, applying the same standard as the district court. *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 890 (5th Cir. 2003). Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

As to Phoenix's breach of contract claim, we agree with the magistrate judge's careful analysis, as approved by the district court. The court held that Wealthmark was contractually obliged to return the commissions Wealthmark had received on the Annuities because the Annuities were rescinded, and Wealthmark breached the Distributor Agreement by not doing so. It is undisputed that a Repayment-of-Commissions provision in the Distributor Agreement generally required Wealthmark to repay sales commissions "should Phoenix for any reason refund or return any amount of any premium payment" on an annuity, including when an annuity was rescinded. Nor is it disputed that "Footnote (e)" of the compensation schedule—attached to and incorporated into the Distributor Agreement—limited that repayment obligation when annuities were "surrendered."[1] The parties disagree only as to whether the Annuities were, in fact, rescinded (such that the general repayment requirement controls and Wealthmark is liable) or surrendered (such that the Footnote (e) exception controls and Wealthmark is off the hook).

The district court correctly explained that the Distributor Agreement does not define the term "surrender," but "technical words are to be interpreted

---

[1] Footnote (e) limited the repayment requirement to fifty percent when annuities were surrendered more than six months after issuance, and it extinguished the repayment requirement when annuities were surrendered more than one year after issuance. The record is silent as to whether, assuming the Annuities were surrendered, they were surrendered within these six- or twelve-month windows, but Phoenix does not dispute that, if the Annuities were surrendered, Wealthmark has no repayment obligation.

as usually understood by persons in the business to which they relate." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 211 (Tex. 2011).[2]  In insurance parlance, "surrender" refers to a policyholder's cancellation of an insurance policy in return for a sum of money, generally referred to as the "cash surrender value" of the policy.[3]  2 COUCH ON INS. § 32:83 (3d ed. 2019); *see also Value*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "Cash Surrender Value" as "[t]he amount of money payable when an insurance policy having cash value . . . is redeemed before maturity or death."). Rescission is legally distinct from surrender.  "Upon rescission of a contract, 'the rights and liabilities of the parties are extinguished and they are restored to the relative positions which they would have occupied had no such contract ever been made.'" *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (quoting *Taylor v. Gill*, 211 S.W. 2d 363, 367 (Tex. Civ. App.—Eastland 1948, no writ.)).  Thus, although surrender and rescission are conceptually both forms of policy cancellation, a key difference is whether the policyholder winds up in the position he was in prior to obtaining the policy.

---

[2] Texas law applies because this is a diversity case.  *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n*, 783 F.2d 1234, 1240 (5th Cir. 1986).

[3] As an example, one of the Annuities contained the following Surrender Provision:

> You may request a withdrawal of the entire Accumulation Value at any time prior to the Contract Maturity Date; this is a surrender.  Surrenders must be made by written request . . . .  Surrender Charges, Market Value Adjustments, and taxes will be applied, if applicable. . . . The payment you will receive is the Cash Surrender Value.  The Cash Surrender Value is an amount equal to the Accumulation Value, adjusted by any applicable Market Value Adjustment, less any applicable Surrender Charges and taxes.

Here, the Annuities were cancelled—in the generic sense of the term—pursuant to the Assurance of Discontinuance that governed Phoenix's settlement with the Minnesota Attorney General. The Assurance of Discontinuance created a claims process, described in a section titled "Rescission Offer," that "gave each policyholder whose annuity was still in force the opportunity to submit a claim to request that their Phoenix annuity be rescinded if they believe[d] they were not fully informed about the terms or conditions of the annuity." In accordance with this process, Phoenix provided relief on 248 annuities. Of those, Phoenix returned all premiums plus interest on 222 annuities. The remaining Annuities were no longer in force at the time the Assurance of Discontinuance was executed, but Phoenix returned "any surrender charges or fees" previously "imposed by Phoenix that resulted in the Policyholder receiving less than the amount of the premium paid to Phoenix for the annuity." In other words, the Annuities were cancelled, and policyholders received compensation designed to put them in the position they would have occupied had they never purchased a Phoenix annuity. That is rescission. Wealthmark was therefore obliged to repay the commissions on the Annuities and, because it did not, Wealthmark breached the Distributor Agreement. Summary judgment was proper on Phoenix's breach of contract claim.

The district court also found Wealthmark's negligence claim was barred by the economic loss rule, which "precludes recovery in tort when the loss complained of is the subject matter of a contract between the parties." *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016) (citing *Sw. Bell. Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)). Wealthmark's briefing on this issue is perfunctory. Wealthmark seeks monetary relief for losses it sustained in "spending substantial sums to promote the business of Phoenix," all of which

was allegedly "lost . . . due to defendants' negligence in the way they handled the sale of their products."  But Wealthmark's alleged losses would not have occurred had it not agreed in the Distributor Agreement to "promote, market, and sell Phoenix products" and to be generally "responsible for all expenses incurred" in fulfilling that commitment.  Thus, Phoenix's alleged malfeasance would not give rise to liability absent the Distributor Agreement.  The economic loss rule therefore applies, and summary judgment was proper on Wealthmark's negligence claim.

Now to damages.  Because the district court granted summary judgment on liability only, the parties tried the issue of damages to the court.  Wealthmark challenges the court's admission of summaries of the commissions Phoenix paid to Wealthmark (Exhibit D10) and Friendshuh (Exhibit D11).  "This court applies a 'deferential abuse of discretion standard' when reviewing a district court's evidentiary rulings." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016)).

Wealthmark first argues the district court erred in admitting Exhibits D10 and D11 because the best evidence of the commissions Phoenix paid was "in the form of checks and/or EFT records that evidenced the actual payments made."  Under Rule 1002, "[a]n original writing, recording, or photograph is required in order to prove its content." FED. R. EVID. 1002.  But Exhibits D10 and D11 were not offered to prove the truth of the factual contents in the checks or electronic transfers; they were used to prove up the balance of the commissions Wealthmark owed Phoenix.  *See Dalton v. F.D.I.C.*, 987 F.2d 1216, 1223 (5th Cir. 1993).  Moreover, the summaries were admitted pursuant to Rule 1006 as summaries of voluminous records.  *See* FED. R. EVID. 1006 ("The proponent may use a summary, chart, or calculation to prove the

contents of voluminous writings, records, or photographs that cannot be conveniently examined in court."). Even if the summaries were used to prove the contents of the "checks and/or EFT records," Rule 1006 operates as an exception to the best evidence rule. CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE EVIDENCE § 8043 (3d ed. 2019). And while there are limits to the admission of summary evidence under Rule 1006, Wealthmark did not challenge Exhibits D10 and D11 on such grounds.

Wealthmark also argues the district court erred in admitting Exhibits D10 and D11 because they were irrelevant, as "they [were] not, and [could not] be conclusive in showing the amounts paid on any particular product sold by Phoenix." But whether evidence is "conclusive" is not the standard. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Phoenix's witness testified that Exhibit D10 summarized and totaled the commissions paid to Friendshuh and that his debt had been transferred to Wealthmark pursuant to the Distributor Agreement. The same witness also testified that Exhibit D11 summarized and totaled the commissions paid directly to Wealthmark. Both exhibits, then, had a tendency to show the amount of commissions Phoenix paid, which was of consequence in determining Phoenix's breach of contract damages. The district court did not abuse its discretion in overruling Wealthmark's objections to Exhibits D10 and D11.[4]

---

[4] Wealthmark submitted written pre-trial objections to Exhibits D10 and D11 that stated "OBJECTION: 401, 402, 403, 901, 1006." At trial, however, Wealthmark only objected on best evidence and relevancy grounds. The district court never ruled on Wealthmark's other written objections, and Wealthmark does not discuss them on appeal. Wealthmark's objections on grounds other than the best evidence rule and relevance are therefore waived.

No. 19-50175

For the foregoing reasons, the district court's summary judgment and evidentiary rulings are **AFFIRMED**.

---

*See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) ("A party waives an issue if he fails to adequately brief it.").