AFFIRM and Opinion Filed July 14, 2023



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-01338-CV**

**KEVIN B. BRASHEAR AND CHRISTOPHER S. KITCHEN,
INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY
SITUATED INDIVIDUALS, Appellants
V.
PANINI AMERICA, INC., Appellee**

**On Appeal from the 160th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-20-08771**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Kennedy
Opinion by Justice Kennedy

Kevin B. Brashear and Christopher S. Kitchen appeal the denial of their motion for class certification in this lawsuit arising from Panini America, Inc.'s (Panini) issuance of redemption cards in connection with its sports trading card business. We affirm the trial court's order denying appellants' request for class certification. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

# BACKGROUND

## I.      Panini's Collections[1]

Panini is incorporated under the laws of the state of Delaware and has its principal place of business in Irving, Texas.  In addition to other sports memorabilia, Panini manufactures and sells sports trading cards.  It holds licenses to produce official NFL, NBA, WNBA, and MLB Players' Association trading cards.

Each year, Panini releases up to 100 or more unique trading card collections, which include more than 80 unique brands and programs and have different price points.  Each trading card collection includes common versions of each cards, known as "base cards," and a range of other cards (sometimes called "insert cards"), such as autographed cards, memorabilia cards, and numbered cards known as "parallels." Autograph and memorabilia cards include signatures, or pieces of equipment or jerseys used during a game.  Autograph cards are either on-card autographs, sticker autographs, or autographed memorabilia/specialty items, which are incorporated into the card.  Parallel cards typically have the same design and photo as base cards but have different color schemes or other design embellishments.

The images below are of memorabilia (left) and autograph (right) cards from the Panini 2014 Select Football collection:

---

[1] The background facts set forth in this opinion concerning Panini and its sports trading card business are derived from evidence Panini presented in connection with its opposition to appellants' motion for class certification.



The following images are of memorabilia (left) and autograph (right) cards from the Panini 2017 Chronicles Baseball collection:



## II.    Packaging and Sale of Trading Cards

Panini packages trading cards in sealed packs (meaning the purchaser will not know which cards are included in a particular pack until the pack is opened) that are

then sold in boxes. The boxes contain either one or multiple sealed packs depending on the particular product.

Panini's collections are packaged separately as "Hobby" boxes, or "Retail" boxes, which contain different product mixes (i.e., different ratios of base cards to insert cards). Hobby boxes are distributed primarily to smaller, specialty retailers such as hobby shops. Retail boxes are distributed primarily to larger, national retailers such as Walmart or Target. Other products commonly referred to as "stock keeping units" (SKU) are packaged separately as "Blaster" boxes, "Hanger" boxes, "Multi-pack" or "Fat Pack" boxes, and "Gravity Feed" boxes, each containing their own unique product mix. Boxes containing SKU products are distributed primarily to larger, national retailers. Multi-pack or Fat Pack boxes and Gravity Feed boxes may also be found at smaller specialty retailers, which may open the boxes and sell the individual packs without displaying the packaging or labeling on the original box.

Some of Panini's product packaging includes "box break" information concerning the average number of autograph or memorabilia cards included in each box; others do not. But this information varies, even within the same collection, based on the specific product mix, the specific SKU, and the specific type of product packaging.

## III.    Redemption Cards

Trading card collections frequently include thousands of autographs that have been hand-signed by professional athletes.  Panini depends on athletes to return autographs in time for product packaging and distribution.  When an athlete fails to timely return an autographed card, Panini follows the usage of trade and standard industry practice of providing a redemption card in place of the actual autographed card.  There is an active secondary market for Panini's redemption cards, and Panini redemption cards are regularly featured on Beckett Collectibles, Inc. d/b/a Beckett Grading Services' "Hot List" of the most desirable cards.

The redemption card pictured below (back and front) is from the Panini 2017 Chronicles  Baseball collection:



Cardholders can redeem redemption cards for the autographed card if it becomes available, or for a comparable substitute card. The redemption process does not require customers to pay money or provide anything else of value to Panini. Redemption cards provide instructions on how to submit a request for redemption to Panini. The cardholders are instructed to scratch off the code on the card and enter the code online or mail the card along with the cardholder's name, mailing and email addresses, and phone number to Panini. The redemption cards also inform the holder that the cards are available as they are received by Panini, and that the specified card may not be available to ship within 4 months. If a customer chooses to wait for the specified card and that card has not become available within 4 months, Panini gives the redemption cardholder notice of three options: (1) to continue waiting for the specified card; (2) to request a substitute card; or (3) to request reward points. This process repeats every 4 months until Panini fulfills the cardholder's redemption request.

Panini issues a relatively small number of redemption cards. Between 2010 and 2020, redemption cards accounted for approximately 0.0585% of all cards that Panini produced. With respect to unfulfilled redemption requests during that period of time, they represent 0.00817% of all Panini cards produced. Panini has fulfilled approximately 86% of the redemption requests submitted, leaving 14% pending.

## IV.  Redemption Requests Submitted by Appellants

Brashear, a resident of the state of Texas, submitted six redemption requests to Panini.  Panini fulfilled all six of his redemption requests with autographed cards for the specific athlete identified on each redemption card.  When he filed his lawsuit, Brashear had one outstanding redemption request, which has since been fulfilled.  That request concerned a redemption card corresponding to an autographed card by Odell Beckham, Jr. that was in a box of 2014 Panini Select Football trading cards Brashear purchased from Nick's Sports Cards and Memorabilia, a third-party retailer.

Kitchen, a resident of the state of Florida, submitted nine redemption requests to Panini.  Panini fulfilled all but one of his requests with autographed cards for the specific athlete identified on each redemption card.  Panini fulfilled the remaining request with a substitute card.  When he filed suit, Kitchen had two outstanding requests, which have since been fulfilled.  Those requests concerned two redemption cards corresponding to autographed cards by Orlando Arcia and Andrew Benintendi from a box break of 2017 Panini Chronicles Baseball trading cards.

## V.  The Lawsuit

Brashear and Kitchen filed suit against Panini claiming they, along with thousands of individual consumers and collectors of sports trading cards across the country, likely exceeding 300,000 individuals, fell victim to:

Panini's predatory scheme involving its knowingly false and misleading guarantee to provide valuable, sought after trading cards, or comparable substitutes, through its use of a process in which it places "redemption cards" in boxes of cards rather than actual specified autographed cards, thereby requiring the individual who received the redemption card to register an online account with Panini and enter the scratch-off code from the redemption card. This starts the consumer's waiting period to receive an actual card, which very often never occurs, or does so after a long period of time, well beyond that which is guaranteed by Panini, and often after the specified autographed cards have lost significant value.

Appellants asserted various causes of action against Panini and sought to recover compensatory and exemplary damages, and attorney's fees and costs.

As part of the suit, appellants sought to certify a nationwide class for some, but not all, of their claims.[2] Specifically, they sought to certify a class for three of their claims under the Texas Deceptive Trade Practices Act (DTPA), TEX. BUS. & COM. CODE ANN. §§ 17.01–.955; specifically, their claims under: (1) Section 17.46(b)(5) for misrepresenting that the redemption cards were legitimate stand-ins, or IOUs, for the specified autographed cards that could be redeemed for delivery of the specified autographed cards; (2) Section 17.50(a)(3) for engaging in an unconscionable action or course of action that took advantage of appellants' and the putative class members' lack of knowledge of Panini's inability to fulfill redemption

_____

[2] In support of their motion for class certification, appellants relied on deposition testimony of appellants and David Sharp, a designated representative of Panini, declarations of appellants, copies of redemption cards, terms and conditions produced by Panini, various reports of Beckett, redemption history, rule 11 agreement regarding the numerosity requirement for class certification, curriculum vitae of proposed class counsel and a trial plan.

requests, of which Panini was well aware; and (3) Section 17.50(a)(2) (addressing breach of an express or implied warranty), as well as Section 2.314 of the Business & Commerce Code (Implied Warranty: Merchantability; Usage of Trade), for selling products that "failed to conform to promises or affirmations of fact made on the container or label" and were "unfit for the ordinary purpose for which redemption cards are used." Included in the class would be persons who received a redemption card in place of the actual specified autographed card, who submitted a redemption request prior to the listed expiration date, and who did not receive the actual specified autographed card of value within the selected timeframe (4 or 8 months) or who did not receive a card of comparable value.

Appellants asserted that they satisfied the four prerequisites to class certification set forth in Rule 42(a) of the Texas Rules of Civil Procedure, numerosity, commonality, typicality and adequacy of representation, and that certification was proper under Rules 42(b)(1)(A) and 42(b)(3) because the prosecution of separate actions by or against the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, and questions of law or fact common to the members of the class predominate and a class action is superior to other methods for adjudication of the claims.

Panini opposed appellants' motion for class certification asserting, in part, that individual questions regarding reliance, damages, consumer status, and the applicable law predominate.[3] Panini also filed traditional and no-evidence motions for summary judgment on appellants' class claims.

The trial court considered Panini's summary judgment motions before addressing appellants' motion for class certification. The trial court denied Panini's motions and then held a hearing on appellants' class certification request. The trial court denied appellants' motion for class certification and made findings of fact and conclusions of law in support thereof. *See* TEX. R. CIV. P. 42(c)(1)(D) (setting forth statements that must be made in an order granting or denying certification under Rule 42(b)(3)).[4] Among the court's findings are the following:

- Reliance is a necessary element of a DTPA claim based on false, misleading or deceptive acts.

- The use of Redemption Cards, in place of autographed cards that are not available for shipment at the time of distribution, is a usage of trade and standard practice in the sports trading card industry.

- Questions of law and fact affecting only individual members predominate over any questions common to the members of the class.

- A class action is not superior to other available methods for the fair and efficient adjudication of the controversy.

---

[3] In support of its opposition to appellants' motion for class certification, Panini relied upon the declaration of David Sharp, various discovery responses, and depositions of appellants and David Sharp.

[4] Note, there is no similar requirement for the denial of class certification under Rule 42(b)(1)(A).

- The issues of law or fact, and mixed issues of both law and fact, affecting only individual class members include:

  1) the specific autographed card associated with each Redemption Card;
  2) the specific card collection from which each Redemption Card was obtained (Panini releases approximately 100 unique card collections annually); how each Redemption Card was obtained;
  3) whether each putative class member meets the statutory definition of a "consumer" under the DTPA;
  4) regarding the cards acquired;
  5) the specific representations made on the product packaging/labeling from which each Redemption Card was obtained (each collection is packaged differently, and cards within the same collection are packaged differently depending on the specific distribution channel);
  6) whether, and how, a putative class member relied on any representation made by Panini;
  7) the specific sources of information (including recommendations from friends and information published by third-parties) upon which each putative class member relied in purchasing the Panini products from which each Redemption Card was obtained;
  8) when each putative class member obtained each Redemption Card;
  9) when each putative class member submitted each Redemption Card to Panini; the market value of any given Redemption Card over time;
  10) the market value of the specified autographed card to be redeemed over time;
  11) the market value of any substitute trading card over time;
  12) the physical condition of any card (whether the specified autographed card, or a substitute trading card) sent by Panini in fulfillment of any Redemption Card;
  13) the specific damages calculation (if any) for each putative class member;
  14) each putative class member's individual course of dealing, if any, with Panini regarding Redemption Cards and Panini's redemption program;
  15) each putative class member's knowledge, ability, experience, or capacity with respect to Redemption Cards and the sports trading card industry;
  16) the merchantability of each Redemption Card;
  17) Panini's course of dealing with each athlete under contract to provide autographs for each Redemption Card, at the time each

Redemption Card was issued (*i.e.*, Panini's knowledge as to the likelihood that each individual athlete would fulfill their contractual obligations to provide autographs);

18)      whether each putative class member waived the ability to participate in a class action proceeding (by accepting Panini's Terms & Conditions);

19)      whether each putative class member's claim is governed by Panini's March 12, 2019 TERMS AND CONDITIONS, or Panini's TERMS OF USE AGREEMENT – REDEMPTIONS, updated October 9, 2021; and

20)      the law of the specific state that applies to each putative class member's acquisition and submission of a Redemption Card (Plaintiffs seek to certify a nationwide class).[5]

- Each putative class member can separately adjudicate their respective claims with Panini. Alternatively, each putative class member can request a substitute trading card, in place of the specified autographed card, according to the terms and conditions printed on each Redemption Card.

- Issues common to the members of the putative class do not predominate over individual issues . . . [because] individual issues predominate regarding alleged damages for all of Plaintiffs' claims. . . . Choice-of-law issues preclude a finding that a class action is superior to other available methods for the fair and efficient adjudication of alleged claims. . . . The consumer status of each putative class member presents individual issues that overwhelm any common issue. . . . Panini's Terms and Conditions present individual issues that overwhelm any common issues. . . . Individual issues predominate on Plaintiffs' DTPA § 17.46(b)(5) claim because that claim requires proof of reliance. . . . Plaintiffs' unconscionability claim under § 17.50(a)(3) cannot be certified for class action treatment because individual issues will overwhelm any common issue. . . . Plaintiffs' breach of implied warranty claims under DTPA § 17.50(a)(2) and Tex. Bus. & Com. Code. § 2.314 cannot be certified for class treatment because individual issues will overwhelm any common issue.

- A class action is not superior to other available methods for the fair, and efficient adjudication of the controversy. The sheer number of individual

---

[5] The trial court also found these issues would be the object of most of the efforts of the litigants and the court.

issues, and the necessary application of the laws of all fifty states, would completely overwhelm any jury, the Court, the Court's resources and staff, and the litigants.

This interlocutory appeal followed.

## DISCUSSION

Appellants urge the trial court abused its discretion by refusing to certify a class. In doing so, appellants challenge the trial courts findings:

- The prerequisites of commonality, typicality, and adequacy of representation were not met for any of appellants' asserted claims [(Rule 42(a) requirements)];

- Common issues do not predominate over individual issues [(Rule 42(b)(3) requirement)]; and

- The class action device is not superior to other available methods for the fair and efficient adjudication of the controversy [(Rule 42(b)(3) requirement)].

In addition, appellants contend the trial court erred in failing to find that the prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, Rule 42(b)(1)(A) requirement.

## I. Standard of Review

Trial courts enjoy a wide range of discretion in deciding whether to maintain a lawsuit as a class action. *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 864 (Tex. App.—Dallas 2003, pet. denied). Thus, appellate courts review a trial court's ruling

–13–

on a request for class certification for abuse of discretion. *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 671 (Tex. 2004). A trial court abuses its discretion when it: (1) acts arbitrarily or unreasonably; (2) does not properly apply the law to the undisputed facts; or (3) rules on factual assertions not supported by the record. *Kondos v. Lincoln Prop. Co.*, 110 S.W.3d 716, 720 (Tex. App.—Dallas 2003, no pet.).

There is no right to litigate a claim as a class action. *Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 439 (Tex. 2000). Rather, Rule 42 of the Texas Rules of Civil Procedure provides only that a court *may* certify a class action if the plaintiff satisfies the requirements of the rule. TEX. R. CIV. P. 42; *id.* The Texas Supreme Court has rejected a "certify now and worry later" approach. *Bernal*, 22 S.W.3d at 435. Actual conformance with Rule 42 is indispensable, and compliance with the rule must be demonstrated, not presumed. *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 205 (Tex. 2007).

As this Court has previously noted, an appellant seeking to reverse an order denying class certification, as appellants do here, faces a formidable task. *Vinson v. Tex. Commerce Bank–Houston Nat'l Ass'n*, 880 S.W.2d 820, 824 (Tex. App.—Dallas 1994, no writ). The appellant must demonstrate not only that it satisfied all the requirements for certification under Rule 42, it must also show that the trial court's refusal to certify was legally unreasonable under the facts and circumstances

–14–

of the case. *Id.* Even if certification would have been proper, a denial may still not be an abuse of discretion because, as a matter committed to the trial court's discretion, denial of a class certification will be upheld on appeal so long as the court acted rationally in the exercise of its discretion. *Id.*

## II. Class Action

The class action is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment. *Bernal*, 22 S.W.3d at 437. It is not meant to alter the parties' burdens of proof, right to a jury trial, or the substantive prerequisites to recovery under a given tort. *Id.* Although a goal of our system is to resolve lawsuits with great expedition and dispatch and at the least expense, the supreme objective of the court is to obtain a just, fair, equitable and impartial adjudication of the right of the litigant under established principles of substantive law. *Id.* (citing TEX. R. CIV. P. 1)). This means that the convenience of economy must yield to a paramount concern for a fair and impartial trial. *In re Ethyl Corp.*, 975 S.W.2d 606, 613 (Tex. 1998). And basic to the right to a fair trial is that each party have the opportunity to adequately and vigorously present any material claims and defenses. *Bernal*, 22 S.W.3d at 437.

Aggregating claims can dramatically alter tort jurisprudence. *Id.* at 438. Under the traditional tort model, recovery is conditioned on defendant responsibility. *Id.* The plaintiff must prove, and the defendant must be given the opportunity to

contest, every element of a claim. *Id.* By removing individual considerations from the adversarial process, the tort system is shorn of a valuable method for screening out marginal and unfounded claims. *Id.* In this way, "[c]lass certification magnifies and strengthens the number of unmeritorious claims." *Id.* (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 746 (5th Cir. 1996)). If claims are not subject to some level of individual attention, defendants are more likely to be held liable to claimants to whom they caused no harm. *Id.*

A class action may be maintained only if it meets all four requirements of Rule 42(a)—numerosity, commonality, typicality, and adequacy of representation. TEX. R. CIV. P. 42(a). In addition, a class action must meet one of three requirements under Rule 42(b). *Id.* 42(b); *Doran v. Clubcorp USA, Inc.*, 174 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.).

In this case, appellants claimed a class action was maintainable under Rules 42(b)(1)(A) and 42(b)(3). Rule 42(b)(1)(A) requires a showing that prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. TEX. R. CIV. P. 42(b)(1)(A). Rule 42(b)(3) requires (1) that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and (2)

–16–

that a class action is superior to other methods for the fair and efficient adjudication of the controversy. *Id.* 42(b)(3).

The predominance requirement set forth in Rule 42(b)(3) is one of the most stringent prerequisites to class certification and must be rigorously applied to prevent class certification when complex and diverse individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present otherwise viable claims and defenses. *Pitts*, 236 S.W.3d at 205. Certification is not appropriate unless it is determinable from the outset that the individual issues can be considered in a manageable, time-efficient and fair manner. *Id.* The test for predominance is not whether common issues outnumber uncommon issues but whether common or individual issues will be the object of most of the efforts of the litigants and the court. *Bernal*, 22 S.W.3d at 434. Courts determine whether common issues predominate by identifying the substantive issues that will control the outcome of the litigation, assessing which issues will predominate, and determining if those predominant issues are common to the class. *Id.* "If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate." *Id.*

### III.  Rule 42(b)(3) – Predominance and Superiority Required

We begin by addressing appellants' contention the trial court erred in finding common issues do not predominate over individual issues.

## A. Common Issues of Law

To establish that common issues of law predominate, appellants, as the class representatives, had the burden of establishing either the consumer protection laws of the fifty states do not differ or one state's law applies to the claims of the entire class. Appellants appear to concede, as the Texas Supreme Court has previously determined, that the consumer protection laws of the fifty states differ. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 695–96 (Tex. 2002). Thus, appellants had to establish one state's law applies under the Restatement (Second) Conflicts of Laws' "most significant contacts" test. *See Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302, 312 (Tex. App.—Texarkana 2004, no pet.) (if laws differ, we consider which state has the "most significant relationship"); *see also* RESTATEMENT (SECOND) CONFLICTS OF LAWS § 145 (1971) (law of the state with the most significant relationship to the particular issue in tort should govern).

Section 148 of the Restatement (Second) Conflicts of Laws addresses claims related to the torts of fraud and misrepresentation and controls the issue presented here. *See id.* § 145, cmt. a. (Sections 146-155 deal with particular torts as to which it is possible to state rules of greater precision); *see also Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205–06 (Tex. 2000); *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 358 (Tex. App.—Dallas 2004, pet. denied). Section 148 contains two subsections. The first governs cases in which all actions (from

misrepresentation to reliance and injury) take place in one state. In such cases, the law of that state generally applies. RESTATEMENT (SECOND) CONFLICTS IN LAWS § 148(1). For class members who live in Texas and had their only contacts with Panini there, Texas most likely has the most significant relationship to their claims. But the analysis is different for all the other class members. Section 148(2) governs transactions that take place in more than one state, and require courts to consider the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations;
>
> (b) the place where the plaintiff received the representations;
>
> (c) the place where the defendant made the representations;
>
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties;
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* § 148(2). The comments to Section 148(2) provide that, when any two of the factors above, except domicile and state of incorporation or place of business, are located within the same state, that state will usually have the most significant contacts. *Id.* cmt. j.

Under factors (a) and (b), the putative class members would most likely have received and acted in reliance on any alleged misrepresentation of Panini in their home states. Under factor (c), alleged misrepresentations contained on product packaging and redemption cards would be made in the location where the product was sold, which would be in Texas. While the place where the defendant made representations and the place where the plaintiff received them are of equal importance, they are outweighed by the place where the plaintiff acted in reliance, likely the plaintiff's home state. *Tracker Marine L.P. v. Ogle*, 108 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Under factor (d), the residences of the putative class members are more important than Panini's place of business because the financial loss involved will usually be of greatest concern there. *Id.* Factors (e) and (f) favor application of the laws of states of the putative class members' residences because that is where the redemption cards were likely located and where any putative class member would have performed. Moreover, consumer protection statutes are intended to protect consumers. Thus, one would expect the state where those consumers reside would have the most significant interest. *Id.* Therefore, it appears that multiple states' laws would apply to the putative class members' claims.

We conclude appellants failed to show that common legal issues predominate. Accordingly, the trial court did not abuse its discretion in concluding questions of

law affecting only individual members predominate over any questions common to the members of the class and choice-of-law issues preclude a finding that a class action is superior to other available methods for the fair and efficient adjudication of alleged claims. Consequently, the trial court did not abuse its discretion in determining appellants failed to show a class action could be maintained under Rule 42(b)(3).

## B. Common Issues of Fact

We concluded above that a nationwide class could not be maintained under Rule 42(b)(3). Additionally, for the reasons set forth herein, we further conclude that even a statewide class could not be certified because of the predominance of individual fact issues.

### 1. Section 17.46(b)(5)

Reliance is an element of appellants' claim under Section 17.46(b)(5). *Schein*, 102 S.W.3d at 693. The burden on appellants to prove reliance in order to recover on their Section 17.46(b)(5) claim is in no way altered by the assertion of claims on behalf of a class. *Id.* Thus, the thousands of putative class members in this case are held to the same standards of proof of reliance, and for that matter all the other elements of their claims, that they would be required to meet if each sued individually. *Id.* This does not mean that reliance or other elements of their causes of action cannot be proved class-wide with evidence generally applicable to all class

members. *Id.* But evidence insufficient to prove reliance in a suit by an individual does not become sufficient in a class action simply because there are more plaintiffs. *Id.* The procedural device of a class action eliminates the necessity of adducing the same evidence over and over again in a multitude of individual actions; it does not lessen the quality of evidence required in an individual action or relax substantive burdens of proof. *Id.* If a plaintiff could prove reliance in an individual action with the same evidence offered to show class-wide reliance, then the issue is one of law and fact common to the class. *Id.* The question the court must decide is whether the plaintiffs have demonstrated that they can meet their burden of proof in such a way that common issues predominate over individual ones. *Id.*

In seeking to certify their Section 17.46(b)(5) claim, appellants urged that common questions regarding reliance predominate because Panini made the same representation to all class members, and the class members were subject to the same terms and conditions and redemption process. Panini argued, and the trial court found, that individual questions regarding reliance predominate precluding class certification of appellants' Section 17.46(b)(5) claim.

By virtue of its decision in *Schein*, the Texas Supreme Court severely limited the ability of plaintiff class representatives to form a class when the issue of reliance is of importance to the resolution of the class claim. *See id.* To maintain a class action under Rule 42(b)(3), consumer reliance upon misrepresentations must be

proved with class-wide proof; class-wide proof requires the existence of class-wide evidence. *Id.* Class-wide evidence requires that there be no differences in how individual members of the class relied on the alleged misrepresentation. *Id.* ("inescapably individual differences cannot be concealed in a throng.").

While the Texas Supreme Court did not entirely preclude class actions in which reliance is an issue, it did make such cases a near-impossibility. *Fid. & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 423 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.). "Reliance is a thought process or one step in a larger thought process; . . . [it] can be shown only by demonstrating the person's thought processes in reaching the decision. Proof of reliance or lack of reliance necessarily requires an individualized determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision." *Grant Thornton*, 133 S.W.3d at 355.

Appellants contend that they have established class-wide reliance on misrepresentations by Panini. Initially, appellants based their argument on their assertion Panini made the same representation to all purchasers regarding the number of autographed cards per box.[6]

---

[6] When Kitchen was asked to identify the statements made by Panini that he relied on in purchasing a Panini product, Kitchen indicated that he relied on the package label, which stated "four autographs per box."

The record before us establishes Panini releases over 100 unique collections each year.  Many of the collections have different packaging that may, or may not, include "box break" information concerning the number of autographed cards.  And Panini distributed many of its collections in boxes that made no representations about the number of autographed cards.  For example, the retail box for the 2017 Chronicles Baseball collection stated:

FIND 1 ABSOLUTE ROOKIES BLUE IN EVERY BOX, ON AVERAGE!

In contrast, the hobby box for the same collection stated:

FIND 4 AUTOGRAPHS OR MEMORABILIA CARDS AND 8 NUMBERED CARDS PER BOX, ON AVERAGE!

Because Panini packages its card collections in multiple ways with different or no box-break information, an individual inquiry regarding the packaging will be required to determine what representation, if any, was made that could conceivably have been relied upon by the individual in making a purchase decision.

In addition, the way a collector acquires a card manufactured by Panini can vary, which impacts the representation, if any, a customer might have been privy to. A collector might acquire a trading card by the case; by the box (hobby or retail); by the sealed pack or packet; or individually at hobby stores; at card shows; on eBay, FaceBook Marketplace and Craigslist; at garage sales and flea markets through case breaks; or as a gift from a case breaker.  Thus, an individual inquiry as to how a collector obtained a redemption card would be necessary.

Collectors, like Kitchen, who acquired "loose" redemption cards on the secondary market are not likely to have relied on packaging statements to make their purchase decisions because the redemption cards would have been removed from Panini's packaging at the time they acquired same.

In addition, Panini presented evidence that, in some cases, the purchasers relied on recommendations from friends and others, rather than any statements made on Panini's packaging. For all of the foregoing reasons, we conclude class-wide evidence of reliance on any packaging representation is lacking.

In an attempt to establish class-wide evidence of reliance to support their assertion their Section 17.46(b)(5) claim may be maintained as a class action; appellants now urge that the relevant reliance for their misrepresentation claim occurred after the underlying purchase and is tied to the redemption process. They contend that the language on the redemption card "scratch off and redeem online" is an unambiguous representation that if you perform the actions as directed then Panini will send the specified autographed card to you. As an initial matter, we note that appellants' characterization of this statement ignores the fact that the redemption cards state that "Redemption cards are available as they are received," that any "specified card" may "not be available to ship within 4 months," and that in response to a timely request Panini will send a comparable card, not the specified autographed card. In addition, we note that the redemption instructions merely explain how to

submit a redemption request online or by mail. The instructions are not a representation or guaranty that any specific card will be delivered within any definitive time period.

Moreover, when we talk about misrepresentations under the DTPA, we are talking about statements, promises or representations made before the contract is signed in order to induce the signing thereof.[7] *McCrea v. Cubilla Condo. Corp. N.V.*, 685 S.W.2d 755, 759 (Tex. App.—Houston [1st Dist.] 1985, writ denied); *Anthony Indus., Inc. v. Ragsdale*, 643 S.W.2d 167, 174 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.). Because redemption cards are sold in sealed packages, a customer would not typically see the redemption instruction until after purchasing the product. Consequently, customers purchasing product in sealed packages could not rely on the redemption card, or any instructions set forth thereon, in making the purchase. Accordingly, and contrary to appellants' assertion, the fact that all of the putative class members submitted a redemption request does not answer the reliance issue as it relates to the Section 17.46(b)(5) claim presented here.

---

[7] Appellants cite *Alford* for the proposition that class-wide reliance can be based on things the plaintiffs saw or did after they purchased the product at issue. *Alford Chevrolet-Geo v. Jones*, 91 S.W.3d 396, 406 (Tex. App.—Texarkana 2002, pet. denied). *Alford* appears to hold that payment of a vehicle inventory tax after the purchase of a vehicle alone sufficed to prove reliance on the dealership's representation that the buyer was responsible for the tax. *See id.* Appellants' reliance on *Alford* is misplaced as appellants did not incur an additional expense in following the instructions concerning the process to redeem the cards. *See id.*

There is no evidence purchasers actually uniformly relied on any representation of Panini. To the contrary, there is significant evidence that Panini's package labels are not uniform, and that purchasers relied on recommendations from others rather than statements made directly or indirectly from Panini.[8] Thus, individual proof will be necessary. *Schein*, 102 S.W.3d at 694. Consequently, we conclude the trial court did not abuse its discretion in concluding the issues of law or fact affecting only individual class members include whether, and how, a putative class member relied on any representation made by Panini.

## 2. DTPA Section 17.50(a)(3)

Appellants' unconscionable-action or course-of-conduct claim is predicated on their assertion Panini's continued issuance of redemption cards took advantage of appellants' and the putative class members' lack of knowledge of Panini's alleged inability to fulfill redemption requests and Panini's admitted failure to send a comparable card of value.

An unconscionable action or course of action is "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." BUS. & COM. § 17.45(5). Texas courts have consistently held that unconscionability claims

---

[8] Brashear indicated that in purchasing the cards from Panini he relied on handwritten signs in his local hobby shop, as well as third-party information published by Beckett. Kitchen stated that in purchasing cards from Panini he relied on the recommendation of a friend, who brought him into collecting again.

involve highly individualized inquiries that are not appropriate for resolution by a class action. *Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 244 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (citing *Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 106–08 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (concluding that individual issues would predominate because defendant must be able to inquire what purchasers would have done with concealed information), and *Peltier Enter, Inc. v. Hilton*, 51 S.W.3d 616, 623–24 (Tex. App.—Tyler 2000, pet. denied) (concluding that individual questions of knowledge, ability, experience, and capacity would predominate)). We are not aware of a single case in Texas in which a class was certified to resolve a DTPA unconscionability claim.

Appellants argue that Panini's active and intentional shielding of information concerning alleged problems fulfilling redemption requests dispenses with the need for any individual inquiry into the putative class members' knowledge, ability, experience, or capacity. Appellants' argument ignores the fact that the record shows (1) information concerning the redemption process was available to customers, (2) Panini was not necessarily "shielding" information from customers and (3) customers have varying degrees of knowledge, ability, experience, and capacity that would affect what they knew or cared to know about the redemption cards and the redemption process. More particularly, as Panini pointed out to the trial court and this Court, as early as 2014, at least one publication discussed the very issues about

which appellants complain.[9]  In addition, the record shows Panini published a substantial amount of information about its redemption program online.  And Panini also published numerous articles showcasing professional athlete's signing Panini products that demonstrate it could take three, four, or even five years to fulfill redemption requests, in some cases.  Thus, and contrary to appellants' assertion, it is apparent that the level of knowledge or experience the class members have with redeeming redemption cards will vary considerably.

In addition, when a disputed practice affects purchasing decisions, the defendant is entitled to inquire into individual class members' knowledge and understanding of the practice because the class members' desire for product could outweigh any objection to the disputed practice.  *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162–63 (Tex. 2007); *see also Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 107 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (what an individual would have done if he had known about the disputed practice is a highly individualized inquiry).

---

[9]  More particularly, in 2014 the following comments were published in a book authored by Jeff Hwang.

> The biggest complaint that collectors have about redemptions is that redemptions can take an indefinite period to be fulfilled. A redemption might take anywhere from a few weeks to several months – and in some cases well over a year – to be fulfilled. Sometimes a player never signs and returns the cards, in which case those redemptions might automatically be replaced by other cards (in other cases, a collector can request a replacement from Topps for redemptions before fulfillment).

Jeff Hwang, THE MODERN BASEBALL CARD INVESTOR, 276 (2014).

In fact, the record shows that Kitchen continued to buy sealed packs and boxes of Panini products despite his belief that Panini would only fulfill half of its redemptions. In contrast, Brashear indicated that he had never seen a redemption card before he received the one at issue here. This discrepancy supports the trial court's conclusion that appellants' unconscionable conduct claim requires an individual inquiry as to each putative class members' knowledge and experience, which necessarily defeats class certification.

Consequently, we conclude the trial court did not abuse its discretion in determining that common issues would not predominate with respect to the putative class member's knowledge, ability, experience, or capacity with respect to redemption cards and the sports trading card industry.

### 3. DTPA Section 17.50(a)(2) and Section 2.314 of the Business and Commerce Code

Appellants sought class certification of their claim Panini breached an implied warranty of merchantability under DTPA Section 17.50(a)(2) and Texas Business and Commerce Code Section 2.314.[10] Appellants assert the products they purchased were unmerchantable because they failed to conform to promises or affirmations of

---

[10] Section 17.50(a)(2) provides, "A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish . . . breach of an express or implied warranty." BUS. & COM. § 17.50(a)(2). Section 2.314 provides, in part, that, "Unless excluded or modified (Section 2.316), a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to good of that kind. . . . Good to be merchantable must be at least such as . . . conform to the promises or affirmations of fact made on the container or label, if any." *Id.* § 2.314.

fact made on the container or label and that the redemption cards were unfit for ordinary use because they did not actually represent any card of value.

Appellants' warranty claim based on representations made on the container or label is not suitable for class treatment because, as more fully discussed above under our discussion of appellants' Section 17.46(b)(5) claim, the language on Panini's product packaging is not uniform. Because Panini packages its card collections in multiple ways with different box break information, the determination of the representation that may have been made in connection with a particular customer's purchase of a Panini product would require an individual inquiry.

There is no class-wide evidence of a uniform promise or affirmation made to all class members because the containers and labels vary based on the packaging and the ways in which collectors acquire redemption cards varies. Accordingly, appellants cannot satisfy the predominance requirement of Rule 42(b)(3) for their breach of implied warranty claim based on packaging information.

With respect to an implied warranty of merchantability, such a warranty can be excluded or modified by course of dealing or course of performance or usage of trade. BUS. & COM. § 2.316(c)(3); *Cate v. Dover Corp.*, 790 S.W.2d 559, 562 (Tex. 1990). "Course of dealing" is defined as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their

expressions and other conduct." BUS. & COM. § 1.303(b). Each individual's course of dealing with Panini is relevant because the specific terms of any implied warranty are expressly defined and modified by their course of dealing leading up to the acquisition of any redemption card. *Id.* § 1.201(b)(3).

Brashear admitted that an individual's receipt of a redemption card could be the first time the individual received such a card or the hundredth time. Kitchen submitted several redemption requests to Panini that Panini fulfilled before the request Kitchen complains about here. Kitchen admitted that based on his experience with prior redemptions for Aaron Judge and Alex Bregman trading cards, he understood that Panini would deliver the autographed cards within the selected or a reasonable time period. Because inquiries would need to be made into each putative class member's course of dealing with Panini, common issues do not predominate.

In addition, the merchantability of each redemption card will be a unique inquiry with respect to each card. For instance, when Brashear purchased his sealed boxes of 2014 Select Football cards in January or February 2016, Beckett listed the Odell Beckham, Jr. redemption card as having the highest secondary market value among the particular collection, even as compared to actual autographed cards for which Panini issued no redemption card. Accordingly, we conclude the trial court did not abuse its discretion in finding individual issues dominate as to the putative

class members' course of dealing, if any, with Panini regarding redemption cards and the merchantability of each redemption card.

### 4. Consumer Status

To bring a DTPA claim, one must be a "consumer" as defined in the statute. BUS. & COM. § 17.50(a). A consumer is one who seeks or acquires, by purchase or lease, any goods or services. *Id.* § 17.45(5). Whether a party is a consumer is a question of law the trial court decides based upon all the evidence. *Allied Towing Serv. v. Mitchell*, 833 S.W.2d 577, 581 (Tex. App.—Dallas 1992, no writ). Whether a party is a consumer under the DTPA depends on the party's relationship to a transaction in goods or services, not by a party's relationship to the opposing party. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981).

All persons in possession of a redemption card may not be consumers. For instance, one who acquired a card by gift is not a consumer under the DTPA. *March v. Thiery*, 729 S.W.2d 889, 896 (Tex. App.—Corpus Christi–Edinburg 1987, no writ); *see also Smith v. Estate of Branch*, No. 05-90-00941-CV, 1991 WL 219469, at *13 (Tex. App.—Dallas Oct. 11, 1991, no writ) (agreeing that those who receive goods by gift or devise are not consumers under the DTPA). Evidence that certain putative class members may not be "consumers" under the statute includes Kitchen's testimony that it was a common practice for case breakers to give purchasers additional packs of cards as "freebies." Thus, the manner in which a putative class

member receives a redemption card may impact the party's consumer status, which impacts the party's standing to pursue a claim.

We conclude common issues do not predominate regarding each putative class members' status as a DTPA consumer. Accordingly, we conclude the trial court did not err in concluding that the consumer status of each putative class member presents individual issues that overwhelm any common issues.

### 5. Damages

Appellants seek compensatory damages for themselves and all putative class members. Where the plaintiffs' damages claim focuses almost entirely on facts and issues specific to individuals rather than the class as a whole, class certification is inappropriate. *Acme Iron & Metal Co. v. Republic Waste Servs. of Tex., Ltd.*, No. 03-17-00664-CV, 2018 WL 6519581, at *4 (Tex. App.—Austin Dec. 12, 2018, no pet.) (mem. op.) (citing *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016)).

The damages issues in this case concern thousands of unique redemption cards, associated with hundreds of different athletes and unique card collections, manufactured and printed in differing quantities, and released over an extensive period of time. Appellants seek damages on the fluctuating secondary market prices for these redemption cards, which can run from a few dollars to several thousands of dollars. An individualized analysis must be undertaken to determine whether the customer suffered any damages and over an extended period of time. Some of the

factors that will come into play are the condition of the card, whether the customer elected to receive a comparable substitute card, the market price for any given card, length of any delay in delivering the card. Thus, we conclude that calculating individual damages for thousands of unique, autographed cards will be fact intensive. We recognize that the necessity of calculating damages on an individualized basis will not necessarily preclude class certification, but the key question is whether the damages calculation is susceptible to a mathematical or formulaic calculation or whether instead the formula by which the parties propose to calculate individual damages is clearly inadequate. *See id.*

We conclude the trial court did not abuse its discretion in concluding issues of law or fact affecting only individual class members include the market value of the specified autographed card to be redeemed over time, the market value of any substitute trading card over time, the physical condition of any card sent by Panini in fulfillment of any redemption card, and the specific damages calculation for each putative class member.

## IV.    Rule 42(b)(1)(A)

With respect to appellants' assertion the trial court should have certified a class under Rule 42(b)(1)(A), while litigation by class members individually may well yield varying results—some may win and some may lose—appellants have not shown how the prosecution of individual actions would establish incompatible

standards of conduct for Panini, dispose of other class members' interests, or impair or impede protection of class members' interests. When, as here, the only risk is that some plaintiffs may win while others may lose on identical facts, the problem of inconsistent or varying adjudication is not raised. *See Peltier*, 51 S.W.3d at 625. Thus, we conclude the trial court did not abuse its discretion in refusing to certify a class under Rule 42(b)(1)(A).

Because we conclude the trial court did not abuse its discretion in finding questions of law and fact affecting only individual members predominate over any questions common to the members of the class, and that class certification under Rule 42(b)(1)(A) is unsupportable, we need not address appellants' remaining arguments concerning Rule 42(a)'s requirements of commonality, typicality, and adequacy of representation. TEX. R. APP. P. 47.1.

## CONCLUSION

Appellants failed to demonstrate that they satisfied all the requirements for class certification under Rule 42. Accordingly, we affirm the trial court's order denying appellants' motion for class certification.

/Nancy Kennedy/
NANCY KENNEDY
JUSTICE

221338F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

KEVIN B. BRASHEAR AND
CHRISTOPHER S. KITCHEN,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHER
SIMILARLY SITUATED
INDIVIDUALS, Appellants

On Appeal from the 160th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-20-08771.
Opinion delivered by Justice
Kennedy. Justices Pedersen, III and
Garcia participating.

No. 05-22-01338-CV          V.

PANINI AMERICA, INC., Appellee

In accordance with this Court's opinion of this date, the order of the trial
court denying appellants' motion for class certification is **AFFIRMED**.

It is **ORDERED** that appellee PANINI AMERICA, INC. recover its costs of
this appeal from appellants KEVIN B. BRASHEAR AND CHRISTOPHER S.
KITCHEN.

Judgment entered this 14th day of July 2023.